AO 91 (Rev. 11/11) Criminal Complaint          AUSA Irene Hickey Sullivan (312) 353-5342

FILED
11/10/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

GERARDO AYUB

CASE NUMBER: 1:25-cr-00726

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From on or about October 24, 2025, to on or about November 9, 2025, at Aurora, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | conspiracy with others known and unknown to knowingly and intentionally distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing fentanyl, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

MICHAEL D'ANDREA
Special Agent, Homeland Security Investigations (HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: November 10, 2025

*Judge's signature*

City and state: Chicago, Illinois

JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and title*

1

UNITED STATES DISTRICT COURT    )
                                )
NORTHERN DISTRICT OF ILLINOIS   )

## AFFIDAVIT

I, Michael D'Andrea, being duly sworn, state as follows:

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI"). I have been so employed since approximately March 2025. Prior to that, beginning in December 2018, I was a Special Agent for IRS Criminal Investigation. At IRS-CI, I was assigned to the High Intensity Drug Trafficking Area and served as a Task Force Officer with HSI. I am currently assigned to HSI Chicago, Homeland Security Task Force and my responsibilities include the investigation of money laundering and narcotics trafficking offenses.

2. As part of my duties as an HSI Special Agent, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including, but not limited to Title 18, United States Code, Sections 1956, 1957, and 1960. I also investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, and the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3. I have received training in narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to

conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4. This affidavit is submitted in support of a criminal complaint alleging that Gerardo AYUB has conspired with others known and unknown to knowingly and intentionally distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing fentanyl, a Schedule II Controlled Substance, in violation Title 21, United States Code, Section 846. The statements made in this affidavit are based on my training and experience, my personal knowledge, law enforcement reports, and information that I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

## FACTS SUPPORTING PROBABLE CAUSE

### A. Summary of Probable Cause

5. As set forth in more detail below, in November 2025, Gerardo AYUB conspired with numerous associates to distribute 400 grams or more of fentanyl in the Northern District of Illinois.

6. Since approximately October 2025, HSI Chicago has been communicating with a cooperating defendant (CD-1)[1] regarding a Mexico-based drug trafficking organization led by an unknown male subject whom CD-1 refers to as

---

[1] CD-1 is cooperating with law enforcement in hopes of receiving potential charging and sentencing consideration following his recent arrest by federal agents in a narcotics-related matter. No threats or promises of any kind have been made to CD-1. CD-1 has previously served a period of imprisonment for a federal felony narcotics conviction. CD-1 has provided information that I find to be credible and that has been corroborated via independent sources.

"Cabrera."[2] CD-1 advised law enforcement that Cabrera is responsible for trafficking kilogram quantities of fentanyl, cocaine, and methamphetamine into the United States from Mexico.

7. According to CD-1, on November 7, 2025, Cabrera, utilizing WhatsApp, messaged CD-1 that a courier could meet CD-1 in the Chicagoland area and provide CD-1 with approximately five kilograms of fentanyl. On or about November 9, 2025, AYUB met with an undercover agent (the "UCA") in Aurora, Illinois and provided the UCA with a bag that contained five kilograms of suspected fentanyl powder. Shortly after the transaction, AYUB was stopped by law enforcement and taken into custody. AYUB provided a recorded statement to law enforcement that implicated AYUB in the distribution of fentanyl throughout the United States.

B. **October 2025 Communications Between CD-1 and Cabrera**

8. According to CD-1 and preserved WhatsApp messages between CD-1 and Cabrera, on or about October 24, 2025, CD-1 messaged Cabrera on WhatsApp regarding the purchase of kilograms of fentanyl powder.[3] During these messages, Cabrera referred to the kilograms as "Feos."[4] Cabrera informed CD-1, "[I]t's going to

---

[2] According to CD-1, he refers to the male subject as "Cabrera" due to his alleged affiliation with the Los Cabreras drug trafficking organization based out of Durango, Mexico.

[3] Some of the recorded/preserved conversations in this investigation have been excerpted and summarized in this Affidavit. The summaries of/quotations from the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations, and these summaries/quotations are in draft form.

[4] Based on my training and experience and conversations with cooperating defendants and sources, I know the term "Feos" to be a Spanish slang term for Fentanyl.

be 17 [kilograms of fentanyl]."[5] Cabrera asked CD-1, "how much [money] can you have for me?" At the behest of law enforcement, CD-1 replied, "For sure, 60 [$60,000] but this weekend I'll get another 25 [$25,000]." Cabrera replied, "[Y]ou said it. Get ready for Tuesday and I'll send them." Cabrera then sent a photograph to CD-1 that depicted an apparent kilogram of a compressed white powder with an imprint of a horse head and the word "Vaquero" imprinted in the powder. Cabrera stated, "[T]hese are it, take a look cousin."

9. According to CD-1 and preserved WhatsApp messages between CD-1 and Cabrera, on or about October 28, 2025, CD-1 continued to message Cabrera on WhatsApp regarding the purchase of 17 kilograms of fentanyl. Cabrera informed CD-1, "[T]hey're [the kilograms of fentanyl] leaving this afternoon headed that way. How's the market over there for the waters?"[6] CD-1 advised it is very cheap. Cabrera asked, "How much are they going for over there?" CD-1 replied, "I'd have to get them at 900 [$900] a pound to move them quickly." Cabrera replied, "I have some in Dallas I can send them but that seems kind of cheap."

10. According to CD-1 and preserved WhatsApp messages between CD-1 and Cabrera, on or about October 29, 2025, Cabrera messaged CD-1 on WhatsApp stating, "We're on the way cousin [with the kilograms of fentanyl]. How much [money] are you going to have? For the driver." CD-1 replied "73 [$73,000]." Cabrera replied,

---

[5] Conversations between the UCA, CD-1, and Cabrera occurred in Spanish. Messages and audio recordings have been translated in draft form by a law enforcement officer that is fluent in Spanish.

[6] Based on my training, experience, and knowledge of this investigation, I believe "waters" to refer to pounds of methamphetamine.

"Sounds good cousin." CD-1 asked, "It's not going to be tonight right?" Cabrera replied, "[I]t's not going to be tonight, no. It's going to be during the day tomorrow."

11. According to CD-1 and preserved WhatsApp messages between CD-1 and Cabrera, on or about October 30, 2025, CD-1 messaged Cabrera on WhatsApp and wrote, "Everything ok? Can you let them know to go towards Aurora, Illinois?" At approximately 10:10 a.m., CD-1 and Cabrera engaged in a recorded voice call via WhatsApp. During the call, Cabrera stated, "[T]he things [kilograms of fentanyl] are in St. Louis. They are offloading them. They're going to offload it and they're going over there [to Aurora]. When they leave St. Louis, I'll let you know." At approximately 1:56 p.m., CD-1 and Cabrera engaged in another recorded WhatsApp call. During the call, Cabrera stated, "[T]hey're barely unloading the truck in St. Louis." CD-1 asked if it would be ready tomorrow. Cabrera replied, "Yeah, he wanted to do it Monday. It's for sure. Just be ready. Once everything is set at the warehouse the driver is going to call me. I already told the driver he's going to Aurora, but if you're not going to be there let me know because the load is going to Detroit but it's coming through Chicago."

12. According to CD-1 and preserved WhatsApp messages, on or about October 31, 2025, Cabrera sent a WhatsApp message to CD-1 and advised that the driver could no longer stop in Chicago and the agreed upon transaction was cancelled.

### C. November 9, 2025, Undercover Transaction with Gerardo AYUB for Five Kilograms of Fentanyl Powder

13. According to CD-1 and preserved WhatsApp messages between CD-1 and Cabrera, on or about November 7, 2025, Cabrera messaged CD-1 via WhatsApp

at approximately 5:01 p.m., and stated, "[C]ousin call me, we can work something out with you if you can." CD-1 replied, advising that s/he was out of town with family but that CD-1's customer was still in Illinois and had the currency ready. Cabrera replied, "I'll send it to you tomorrow. I'll send you 5 [kilograms of fentanyl]." Cabrera asked CD-1 if CD-1's customer would still be giving the driver "75 [$75,000] for 5 [kilograms of fentanyl]." CD-1 replied in the affirmative.

14. According to CD-1 and a preserved WhatsApp message, or about November 8, 2025, Cabrera messaged CD-1 on WhatsApp at approximately 11:52 a.m., and wrote, "They're coming this afternoon. They're coming today cousin."

15. The UCA provided an undercover phone number to CD-1, which CD-1 subsequently passed to Cabrera via WhatsApp message. According to CD-1 and preserved WhatsApp messages between CD-1 and Cabrera, CD-1 advised Cabrera that since CD-1 was out of town, Cabrera could communicate directly with CD-1's customer (the UCA) to avoid any delays. Cabrera agreed.

16. According to the UCA and preserved WhatsApp messages between the UCA and Cabrera, on or about November 8, 2025, at approximately 12:23 p.m., the UCA received a WhatsApp message from the phone number associated with Cabrera. The UCA asked Cabrera, "When will it [the fentanyl] arrive[?]" Cabrera replied "Tonight." The UCA asked, "How many [kilograms] do you have set aside for me?" Cabrera replied, "He is bringing you 5 [five kilograms of fentanyl]." At approximately 6:20 p.m., the UCA received a WhatsApp call from Cabrera. During the recorded call, Cabrera advised that the driver would be able to meet the UCA during the morning

hours of November 9, 2025, and Cabrera requested a general location to send the driver to. Following the call, the UCA sent Cabrera a WhatsApp message that read, "Aurora near Farnsworth and I88. I88 is the highway and the exit is Farnsworth. Tomorrow at 9 in the morning." Cabrera replied "Perfect."

17. According to the UCA and preserved WhatsApp messages between the UCA and Cabrera, on or about November 9, 2025, at approximately 7:18 a.m., Cabrera messaged CD-1 via WhatsApp and wrote, "[C]ousin the compa arrived yesterday with the 5 [kilograms of fentanyl]. Your friend should be leaving he said early. And he does not answer." At approximately 8:41 a.m., the UCA sent Cabrera a WhatsApp message that read, "Walmart 2900 Kirk Rd, Aurora, IL 60502." Cabrera replied, "[O]k how long sir?" The UCA replied, "15-20 depends on traffic but I am on my way. What is your guy in?" At approximately 9:05 a.m., the UCA sent Cabrera a WhatsApp message that read, "I arrived my friend." Cabrera replied, "Ford White 4 doors. Diesel".

18. On or about November 9, 2025, at approximately 9:05 a.m., the UCA, who was equipped with audio/video recording devices, arrived with covert law enforcement officers at a shopping center parking lot near the intersection of Butterfield Road and Kirk Road, in Aurora. Upon arrival, the UCA sent Cabrera a photo of the UCA's surroundings in the parking lot and advised that s/he had arrived.

19. At approximately 9:11 a.m., law enforcement surveillance observed a white Ford truck bearing MO registration 4PBH71 arrive in the parking lot and park

several rows behind the UCA.[7] According to the UCA and preserved WhatsApp messages between the UCA and Cabrera, the UCA informed Cabrera that s/he was in a silver Mercedes. A short time later, law enforcement observed the white Ford truck begin to move in the parking lot and circle the area where the UCA was parked.

20. At approximately 9:12 a.m., law enforcement observed the white Ford truck park next to the UCA's vehicle. Law enforcement then observed an individual, later identified as AYUB, exit the driver's seat of the Ford with a black plastic bag in hand and enter the front passenger door of the UCA's vehicle. According to the UCA and the covert audio/video recording, AYUB sat in the front passenger seat and stated to the UCA, "[T]here's 5", while holding the black plastic bag. The UCA advised AYUB that the currency was in the trunk of his/her vehicle and instructed AYUB to place the bag in the trunk and retrieve the currency. Law enforcement observed AYUB exit the front passenger door and walk to the open trunk of the UCA's vehicle. AYUB placed the black plastic bag in the trunk and retrieved a bag that law enforcement had previously filled with sham currency. Law enforcement observed AYUB enter the Ford truck with the bag of sham currency and begin to depart the area.

21. Law enforcement observed AYUB drive out of the shopping center parking lot and travel south on Farnsworth Avenue. AYUB then pulled west onto Butterfield Road and drove back in the parking lot of the shopping center where the meeting with the UCA occurred, at a high rate of speed. AYUB then parked the Ford

---

[7] A check of a law enforcement database revealed the Ford truck to be registered to Gerardo AYUB at an address on the 11900 block of E 41st Street, in Independence, Missouri.

on the south end of the Walmart parking lot. At approximately 9:17 a.m., law enforcement activated emergency lights, approached AYUB while he was parked, and requested AYUB to exit the vehicle, to which he complied. Law enforcement deployed a police K9 to the exterior of the Ford and received a positive alert for the presence of the odor of narcotics.

22. Law enforcement conducted a search of AYUB's vehicle, which revealed the bag that contained the sham currency. Law enforcement observed that the bag was opened and recovered a bundle of sham currency from in between the driver's seat cushion and the center console. Law enforcement observed that AYUB had torn a corner of the shrink wrap off the bundle of sham currency, which exposed the corner of the sham bills. During a further search of AYUB's vehicle law enforcement discovered a box that contained several NARCAN nasal spray canisters. Law enforcement placed AYUB in custody and transported him to a local police station.

23. Law enforcement met with the UCA at a pre-determined location, inspected the contents of the black plastic bag that had been provided by AYUB, and discovered that it contained five rectangular brick-shaped items wrapped in tan tape, consistent with kilograms of narcotics.

24. At approximately 11:12 a.m., law enforcement met with AYUB in an interview room. The interview was audio and video recorded. Law enforcement read AYUB his *Miranda* warning from a pre-printed form. AYUB acknowledged he understood his rights, signed the form, and agreed to speak with law enforcement without an attorney present. During the interview, AYUB stated that he knew that

the five packages he provided to the UCA contained a compressed white powder that he believed to be a controlled substance but denied knowing that the packages contained fentanyl.

25. On or about November 10, 2025, at approximately 08:10 a.m., law enforcement conducted a field test on one of the kilograms provided by AYUB to the UCA, which yielded a positive indication for the presence of fentanyl. Law enforcement discovered the total weight of the suspect narcotics fentanyl to be 5.15 kilograms.

## CONCLUSION

26. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that on or about November 9, 2025, GERARDO AYUB knowingly and intentionally conspired with others known and unknown to distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing fentanyl, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

_____
MICHAEL D'ANDREA,
Special Agent, Homeland Security Investigations

SWORN TO AND AFFIRMED by telephone November 10, 2025.

_____
JEFFREY T. GILBERT
United States Magistrate Judge